UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDENBROOK CAPITAL, LLC, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>RHYTHMONE PLC, et al.,<br><br>Defendants. | Case No. 19-cv-00615-WHO<br><br>**ORDER GRANTING MOTION TO DISMISS IN PART AND DENYING IN PART**<br><br>Re: Dkt. No. 18 |

Plaintiffs Edenbrook Capital, LLC, Edenbrook Long Only Value Fund, LP, and Edenbrook Value Fund, LP (collectively "Edenbrook") allege that defendants RhythmOne Plc and YuMe, Inc. (f/k/a Redwood Merger Sub II, Inc.) ("Merger Sub II") (collectively "RhythmOne") violated Section 14(e) of the Securities and Exchange Act of 1934 ("Exchange Act") by making a false and misleading statement and omission in a tender offer. Edenbrook claims that RhythmOne's statements misled it into believing that both tendering and non-tendering shareholders would have the option to electronically convert their stock post-merger. While RhythmOne has arguments to explain why Edenbrook's claim is wrong, for purposes of pleading Edenbrook has plausibly alleged a material omission and resulting loss causation. For these reasons, I DENY RhythmOne's motion to dismiss.[1]

---

[1] RhythmOne represents that there are two other issues in this case that it does not raise. First, is there a private right of action under section 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(e)? Defendant's Motion to Dismiss Complaint ("Mot.") at 1-2 [Dkt. No. 18]. Second, if there is a private right of action under section 14(e), must Plaintiffs allege scienter? *Id.* RhythmOne asserts that under current Ninth Circuit caselaw, the answer to the first question is "yes" and to the second question is "no," but that both issues are currently on appeal before the Supreme Court. *Varjabedian v. Emulex Corp.*, 888 F.3d 399 (9th Cir. 2018), *cert. granted*, 139 S. Ct. 782 (2019). On April 23, 2019, the Supreme Court dismissed the writ of certiorari in *Varjabedian* as improvidently granted. *Emulex Corp. v. Varjabedian*, 587 U.S. ____ (2019). Because the Ninth Circuit's decision in *Varjabedian* remains controlling, no other argument is

# BACKGROUND[2]

## A. The Parties

Plaintiff Edenbrook Capital, LLC is a New York limited liability company that manages private investment funds, including the other two plaintiffs Edenbrook Long Only Value Fund, LP and Edenbrook Value Fund, LP. Complaint at ¶¶ 11-13 ("Compl.") [Dkt. No. 1]. Defendant RhythmOne Plc is a public company incorporated under the laws of England and Wales with its principal place of business in San Francisco, California. *Id.* at ¶14. RhythmOne Plc's shares are not listed on a U.S. national securities exchange and are traded on the London Stock Exchange's AIM exchange. *Id.* at ¶ 48.

In this case, two entities have used the name YuMe, Inc. The first is the original (and non-party) YuMe, Inc. ("YuMe") that Edenbrook invested in. *Id.* at ¶ 17. YuMe no longer exists as a result of its merger with defendant Merger Sub II, which later changed its legal name to YuMe, Inc. as well. *Id.* at ¶ 15. For the purposes of this order, "YuMe" will refer to the original company that Edenbrook invested in, while "Merger Sub II" will refer to named defendant YuMe, Inc. Merger Sub II is a subsidiary of RhythmOne. *Id.*

Edenbrook had invested in YuMe since 2014. *Id.* at ¶ 18. At the time of the merger in 2017, Edenbrook collectively owned more than 2.6 million shares of YuMe common stock, representing over 7% of YuMe's total outstanding stock. *Id.*

## B. The Merger Agreement Between RhythmOne and YuMe

On September 4, 2017, YuMe entered into an Agreement and Plan of Merger and Reorganization (the "Merger Agreement") with RhythmOne, non-party Redwood Merger Sub I, Inc. ("Merger Sub I"), a Delaware corporation, and Merger Sub II. *Id.* at ¶ 19. The Merger Agreement contemplated a two-step merger (the "Transaction"). RhythmOne would first make a tender offer for all YuMe common stock, with each share of YuMe stock to be exchanged for the

---

required on the above two issues.

[2] I grant RhythmOne's requests for judicial notice [Dkt. No. 19, 23] because the documents are matters of public record. *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (*citing* Fed. R. Evid. 201).

right to receive $1.70 in cash and 0.7325 ordinary shares of RhythmOne. *Id.* Assuming RhythmOne acquired more than 50% of YuMe's common stock through the tender offer and the transaction closed, Merger Sub I would acquire all remaining YuMe shares through a merger into YuMe ("the First Merger") leaving YuMe as the surviving entity. *Id.* at ¶¶ 20-22. Immediately following the First Merger, YuMe would then merge with and into defendant Merger Sub II (the "Second Merger"), with Merger Sub II surviving the Second Merger as a wholly-owned subsidiary of RhythmOne. *Id.* at ¶ 20.

The First Merger would be effectuated pursuant to Section 251(h) of the Delaware General Corporation Law ("Section 251(h)"), which permits a merger to take place via tender offer without a shareholder vote on the merger agreement. *Id.* at ¶ 21; Del. Code Ann. tit. 8, §251(h). Section 251(h) mandates that "[e]ach outstanding share . . . of each class or series of stock . . . that is the subject of and is not irrevocably accepted for purchase or exchange . . . is to be converted in such merger into, or into the right to receive, the same amount and kind of cash, property, rights or securities to be paid for shares of such class or series of stock of such constituent corporation irrevocably accepted for purchase or exchange in such offer." Del. Code Ann. tit. 8, §251(h)(5).

On the same day the Merger Agreement was signed, RhythmOne entered into a support agreement with the members of the YuMe Board, and others (the "Supporting Stockholders"), to support the Transaction and to not sell their YuMe stock for six months following the First Merger. *Id.* at ¶ 23. Together the Supporting Stockholders owned approximately 31.6% of YuMe's outstanding shares. *Id.*

### C. RhythmOne's Tender Offer

RhythmOne commenced the tender offer by filing a Form F-4 Registration Statement with the Securities and Exchange Commission ("SEC") on December 22, 2017 (the "Initial Offer Filing"), which became public on December 26, 2017. *Id.* at ¶ 28; *see also* Request for Judicial Notice ("RJN") Exhibit A [Dkt. No. 19-1]. Edenbrook identifies several statements in the the Initial Offer Filing that it alleges were misleading. *Id.* at ¶¶ 28-32. Those statements are as follows:

> Accordingly, RhythmOne anticipates that, if the Offer is completed,

> the First Merger will be completed on the same day as the Offer. In the First Merger, Purchaser will merge with and into YuMe, with YuMe surviving the First Merger. At the Effective Time, each outstanding YuMe Share that was not acquired in the Offer (other than certain dissenting, converted or cancelled shares, as described further in this prospectus/offer to exchange) will be converted into the right to receive the Transaction Consideration.

*Id.* at ¶ 29; *see also* RJN Ex. A at 25.

> The purpose of the First Merger is for RhythmOne to acquire all remaining YuMe Shares that it did not acquire in the Offer. In the First Merger, each outstanding YuMe Share that was not acquired by Purchaser in the Offer (other than certain dissenting, converted and cancelled shares, as described further in this prospectus/offer to exchange) will be converted into the right to receive the Transaction Consideration.

*Id.* at ¶ 30; *see also* RJN Ex. A at 109.

> Section 251(h) of the DGCL provides that following the consummation of a successful tender offer for the outstanding shares of voting stock of a corporation whose shares are listed on a national securities exchange, and subject to certain statutory provisions, if the acquiring corporation owns at least the amount of shares of each class or series of stock of the target corporation that would otherwise be required to adopt a merger agreement providing for the merger of the target corporation, and **as soon as practicable thereafter each outstanding share of each class or series of stock of the target corporation subject to, but not tendered in, the tender offer is subsequently converted by virtue of such a merger into, or into the right to receive, the same amount and kind of consideration for their stock in the merger as was payable in the tender offer**, the acquiring corporation can effect such a merger without the vote of the stockholders of the target corporation.

*Id.* at ¶ 31; *see also* RJN Ex. A at 120 (emphasis added).

RhythmOne filed amendments to the Initial Offer Filing on January 4, 2018, January 16, 2018 and January 26, 2018 and filed its final offer via Form 424B3 on February 1, 2018. *Id.* at ¶¶ 33-34. All above statements were contained in all amendments and the final offer. *Id.* RhythmOne's tender offer to YuMe's stockholders expired at the end of the tender period, one minute after 11:59 P.M., Pacific Standard Time, on February 1, 2018. *Id.* at ¶ 37.

At the end of the tender period, approximately 74.4% of YuMe common stock was validly tendered. *Id.* at ¶ 37. As a result, Edenbrook's shares were subject to the First Merger between YuMe and Merger Sub I in accordance with Section 251(h). *Id.* at ¶ 39. The First Merger became effective five hours later, at 5:00 A.M. Pacific Standard Time on February 2, 2018. *See*

Supplemental Request for Judicial Notice, filed herewith ("Supp. RJN"), Ex. A, at 2 [Dkt. No. 23]. The Second Merger with Merger Sub II closed 30 minutes later, at 5:30 A.M. Pacific Standard Time on February 2, 2018. *See* Supp. RJN Ex. B at 2.

Edenbrook vocally opposed the transaction. Compl. at ¶¶ 25-27. Consistent with its opposition, Edenbrook did not tender its YuMe shares. *Id.* at ¶ 39.

### D. Delivery of Transaction Consideration to YuMe Shareholders

On or about February 6, 2018, all YuMe stockholders who tendered their shares received the cash and had their YuMe shares electronically converted into RhythmOne shares. *Id.* at ¶ 38. Edenbrook, as non-tendering stockholder, received its cash on February 6, 2018, but it was not given the option to electronically convert its stock. *Id.* at ¶ 41. Instead, RhythmOne mailed physical stock certificates to Edenbrook's broker two weeks after tendering shareholders received their stock electronically. *Id.* at ¶¶ 41-42. Edenbrook's broker received a single physical stock certificate for all its clients and presumably took two weeks to "break down" the certificate into the individual holdings of each of its clients before delivering them to Edenbrook on March 8, 2018. *Id.* at ¶¶ 43-46.

By the time Edenbrook received its converted RhythmOne stocks, RhythmOne's share price had dropped approximately 20% below its price when the tender offer was consummated and the volume of trading had declined. *Id.* at ¶ 47. Because Edenbrook's position in RhythmOne stock was multiples of its daily trading volume, it alleges that there was no viable way to liquidate its position without destroying RhythmOne's share price. *Id.* at ¶ 50. As a result, Edenbrook alleges that it still holds shares that are a fraction of their value at the time of the merger and that it has suffered damages. *Id.* at ¶¶ 50, 68.

Edenbrook states that if it had received its RhythmOne shares on the same day that tendering stockholders did, it would have sold the shares immediately based on RhythmOne's risk factor disclosure regarding its own liquidity:

> *RhythmOne does not currently intend to list the RhythmOne Shares on a U.S. national securities exchange, and therefore a U.S. trading market for RhythmOne Shares may not develop.*
>
> RhythmOne currently does not intend to list the RhythmOne Shares

> on a U.S. national securities exchange. Liquidity in AIM-traded shares tends to be significantly lower than that of NYSE-traded shares. This could make it more difficult for you to sell your RhythmOne Shares following the closing of the Transactions and could adversely affect the price of those shares. Reduced liquidity also could result in increased volatility, and the price for the RhythmOne Shares may vary significantly in the future.

*Id.* at ¶¶ 6, 48 (emphasis in original). Edenbrook also claims that had it known that by declining to tender its shares it would not receive them until a month after the merger closed, it would have tendered its shares rather than be in the position it is in now. *Id.* at ¶ 6.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 570.

Section 14(e) of the Exchange Act prohibits a person from making "any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation." 15 U.S.C. § 78n.

Rule 9(b)'s heightened pleading requirements apply to claims asserted under Section 14(e) of the Exchange Act. *See, e.g., Deutsch v. Flannery*, 823 F.2d 1361, 1362 (9th Cir. 1987) (applying Rule 9(b) to 14(e) claim that tender offer solicitation "failed to disclose" material information). "To satisfy Rule 9(b), a pleading must identify the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about [the purportedly

fraudulent] statement, and why it is false." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (internal quotation marks and citations omitted).

Moreover, plaintiffs must satisfy the additional standards of the Private Securities Litigation Reform Act ("PLSRA"). 15 U.S.C. § 78u-4(b)(1). Unlike Rule 9(b), the PSLRA requires a plaintiff to plead with particularity facts giving rise to a "*strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added); *see also* Fed. R. Civ. P. 9(b) ("[C]onditions of a person's mind may be alleged generally."). The Ninth Circuit recently found that the level of culpability required for Section 14(e) violations is negligence. *Varjabedian*, 888 F.3d at 401, 408. Therefore, "[p]laintiffs must plead with particularity facts that give rise to a strong inference of negligence." *In re Ocera Therapeutics, Inc. Sec. Litig.*, No. 17-cv-06687-RS, 2018 WL 7019481, at *3 (N.D. Cal. Oct. 16, 2018).

In deciding whether a plaintiff has stated a claim upon which relief can be granted, the court accepts plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

If the court dismisses the complaint, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000). In making this determination, the court should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." *Moore v. Kayport Package Express*, 885 F.2d 531, 538 (9th Cir. 1989).

**DISCUSSION**

**I. THE MATERIAL OMISSION CLAIM**

The crux of Edenbrook's complaint is that RhythmOne's failure to disclose that non-tendering shareholders would not have an option to electronically convert their shares of YuMe

7

stock constitutes a material omission. Compl. at ¶ 55. Edenbrook claims that RhythmOne's mail delivery of physical stock certificates instead of electronic conversion is a deviation from standard market practice and is a "cumbersome and off-market method" intended to punish non tendering shareholders. *Id.* at ¶¶ 41, 52-53.

To state a claim for a material omission under Section 14(e), the "omission must be misleading; in other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (internal citation omitted). As the Ninth Circuit stated in *Varjabedian*, a plaintiff "must plead a highly unreasonable omission," involving "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care," and "which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Varjabedian*, 888 F.3d at 408 (*quoting Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009)). Further, Section 14(e) prohibits only misleading and untrue statements, not statements that are incomplete. *Brody*, 280 F.3d at 1006.

RhythmOne moves to dismiss Edenbrook's omission-based claim, arguing that there was no material omission because all stockholders received the same set of instructions stating that YuMe shares would be converted either by issuing paper stock certificates or by using Euroclear's CREST system. Mot. at 7-9. RhythmOne explains that because RhythmOne Plc is a UK corporation and listed on the London Stock Exchange's AIM exchange, its stock must be handled differently than stock listed on US exchanges. *Id.* at 7-8. An electronic exchange of an AIM-listed stock for a NYSE-listed stock cannot be wholly accomplished through the Depository Trust Company and Cede & Company, as would normally occur with US-listed stocks. *Id.* (*citing* RJN Ex. A at 26-27, 117-18; RJN Ex. B at 26-27, 117-18, 644, 650-51, 663, 665, 669, 671). Instead, stock transfers involving AIM-listed shares must be made either by issuing paper stock certificates or through Euroclear's CREST system. *Id.* Euroclear is the central securities depository for the United Kingdom and allows securities to be transferred electronically. *Id.* (*citing* RJN Ex. B. at 699).

According to RhythmOne, because only tendering shareholders were given the option to provide CREST instructions when they filled out the tender documents, by default non-tendering shareholders would understand that only paper stock certificates would be available to them. *Id.* at 8-9. It argues that although its statements could have been more specific, Edenbrook has only identified non-actionable incomplete statements under Section 14(e). *Id.*

In opposition, Edenbrook argues that it should not be expected to "figure out" that it would not be given the option to electronically convert its shares from the disclosures and that all disclosures about CREST were expressly directed only toward tendering shareholders and did not suggest that non-tendering shareholders would be treated differently. Plaintiff's Opposition to Defendant's Motion to Dismiss ("Oppo.") at 14-16 [Dkt. No. 21]. Instead, Edenbrook claims that based on both RhythmOne's express disclosures that it would treat tendering and non-tendering shareholders equally and general market practice, it understood that RhythmOne would make provisions for non-tendering shareholders to also electronically convert their stock via CREST. *Id.* It characterizes providing CREST information as an administrative formality and that it had no reason to conclude that it would not have an opportunity to provide CREST information after the completion of the merger. *Id.* Finally, it contends that even if it is "conceivable" that an investor would understand the disclosures cited by RhythmOne to mean that there would be no electronic conversion option for non-tendering stockholders, that is not the only plausible interpretation. *Id.* Rather, in light of the disclosed risk factor that RhythmOne's shares would likely be illiquid post-closing, its interpretation of the disclosures is more plausible and sufficient to survive a motion to dismiss where I must construe Edenbrook's pleadings in a light most favorable to it. *Id.*

RhythmOne replies that Edenbrook confuses pleading and materiality standards and that any alleged omission is immaterial. Reply in Support of Defendants' Motion to Dismiss ("Reply") at 4-6 [Dkt. No. 22]. A misstatement or omission is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). A plaintiff need not allege that a misstatement or omission would have caused a reasonable investor to change her vote. *See id.* Rather, "there must be a substantial likelihood that the disclosure of the omitted fact would have

9

been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* "The 'total mix' of information normally includes information that is and has been in the readily available general public domain and facts known or reasonably available to the shareholders." *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 216 (5th Cir. 2004) (internal citation omitted).

Edenbrook's claim that RhythmOne's failure to explicitly state that non-tendering shareholders would not be given an option to electronically convert their stock, taken together with the allegations that delivering paper stock certificates is not a typical practice in a merger and that RhythmOne's shares are less liquid because they are traded on a U.K. stock exchange, sufficiently alleges a material omission. A reasonable shareholder who opposes RhythmOne's tender offer would be concerned that the market for RhythmOne's shares, as described by RhythmOne in its disclosures, would present liquidity issues. Because such a shareholder would likely want to sell their shares in RhythmOne stock quickly based on the belief that the merger is a poor decision, having no option to electronically convert shares in a way that would allow for a quick sale would be material and alter the total mix of information. Whether the delivery of paper stock certificates is actually atypical or RhythmOne's stock is actually as illiquid as alleged are questions reserved for summary judgment or trial.

Relatedly, the parties disagree on applicability of *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982 (9th Cir. 2008). Oppo. at 15; Reply at 6. In *Berson*, the defendant's customers were almost all government customers who could, at any time and for any reason, issue a "stop-work order" forcing the defendant to stop working on an existing contract. 527 F.3d at 984. The plaintiffs alleged that since most stop-work orders ended in cancelled contracts, the company misled investors by counting stopped work as part of its backlog when it knew it would likely never perform those contracts. *Id.* The Ninth Circuit held that while the defendant did not necessarily have an affirmative duty to disclose its stop-work orders, once it chose to tout its backlog as a sign of coming financial health, it had to do so in a manner that would not mislead investors about the contents of the backlog. *Id.* at 985-987. In reaching this conclusion, the court rejected the defendant's argument that reasonable investors would accurately interpret the

10

description of the backlog (containing "uncompleted portions of existing contracts") to include stop-work orders because a stop-work order did not actually cancel the contract, even though the defendant did not expect to complete the work. *Id.* The court reasoned that while this was a conceivable interpretation of the disclosure, it was not the only, or even most plausible one, and an investor could interpret it differently. *Id.* Therefore, the court could not say that as a matter of law that the statement was not misleading at the motion to dismiss stage. *Id.*

By contrast, RhythmOne asserts that its disclosures explicitly stated that stock conversions would be done by paper certificate if the stockholder did not furnish CREST instructions and that because non-tendering stockholders could not furnish CREST instructions, the only reasonable conclusion is that they would receive their conversions by paper certificate. *Id.* I find *Berson* persuasive and agree with Edenbrook at this stage. Although RhythmOne's interpretation of its statements is plausible, it is not the only, or even most likely, interpretation to be gleaned from its statements on share conversion. It does not support a finding that its alleged omission was not misleading as a matter of law at this stage. RhythmOne's motion to dismiss Edenbrook's omission claim is denied.[3]

## II. THE MATERIAL MISSTATEMENT CLAIM

There appears to be some confusion between the parties about what Edenbrook is alleging was the actionable material misstatement contained in RhythmOne's merger filings. Mot. at 5-7; Oppo. at 12-14. In its opposition, Edenbrook clarifies that the misstatement from the Initial Offer Filing that forms the basis of its claim is:

> The First Merger will be completed as soon as practicable following Purchaser's acceptance of YuMe Shares tendered in the Offer if the Offer is completed, assuming the satisfaction or waiver of the other conditions to the Merger at such time. If the Offer is completed, the

---

[3] RhythmOne, at the end of its reply, states that if it had insisted that non-tendering shareholders also provide their CREST information before the tender offer closed, opponents such as Edenbrook would have accused it of attempting to coerce them to tender. Reply at 9-10. RhythmOne contends that it would only expect a small percentage of non-tendering shareholders to provide CREST information because non-tendering shareholders usually do not need to submit anything if they do not wish to accept a tender offer. *Id.* It also asserts that had it solicited CREST information from non-tendering shareholders post-closing, it would have been difficult logistically and delayed conversion further. *Id.* While this may all be true, a motion to dismiss considers only the facts alleged in the complaint; these arguments are not relevant now.

11

> First Merger will be subject to Section 251(h) of the DGCL, which means that no vote of YuMe stockholders will be required to complete the First Merger. Accordingly, RhythmOne anticipates that, if the Offer is completed, the First Merger will be completed on the same day as the Offer. In the First Merger, Purchaser will merge with and into YuMe, with YuMe surviving the First Merger. At the Effective Time, each outstanding YuMe Share that was not acquired in the Offer (other than certain dissenting, converted or cancelled shares, as described further in this prospectus/offer to exchange) will be converted into the right to receive the Transaction Consideration. After the First Merger, YuMe will be held as a wholly-owned subsidiary of RhythmOne, and the former stockholders of YuMe will no longer have any direct ownership interest in the surviving corporation.

Oppo. at 12; Compl. at ¶ 29. In Edenbrook's view, by sending physical stock certificates to non-tendering stockholders, RhythmOne failed to comply with Section 251(h) to provide the same consideration to non-tendering shareholders "as soon as practicable" following the consummation of the tender offer. Oppo. at 12-14.

RhythmOne responds that Edenbrook's misstatement claim fails because: (i) what Section 251(h)(1)(b) says is that "merger shall be effected" not "shares not tendered must be converted" as soon as practicable; (ii) the First and Second Mergers were in fact completed shortly after the tender period; and (iii) a violation of Section 251(h) cannot support a Section 14 claim. Reply at 2-3.

I agree with RhythmOne's first and second arguments and need not reach its third. As RhythmOne correctly noted, Section 251(h)(1)(b) requires only the "merger" be completed as soon as practicable. Del. Code Ann. tit. 8 §251(h)(1)(b). The Delaware Court of Chancery explained that this means "the second-step merger must be effected as soon as practicable following the consummation of the first-step tender offer." *In re Volcano Corp. Stockholder Litig.*, 143 A.3d 727, 743 (Del. Ch. 2016) (*citing* Del. Code Ann. tit. 8, §251(h)(1)(b)). Here, the second-step merger is the First Merger between Merger Sub I and YuMe. After RhythmOne's tender offer expired one minute after 11:59 P.M., Pacific Standard Time, on February 1, 2018, the First Merger became effective five hours later, at 5:00 A.M. Pacific Standard Time on February 2, 2018. Compl. at ¶ 37; Supp. RJN, Ex. A at 2. The complaint only alleges that the conversion of shares to non-tendering shareholders was not "as soon as practicable," not completion of the First Merger. Compl. at ¶ 54. It appears that Edenbrook confused the completion of the First Merger

1  and the delivery of stock consideration.  RhythmOne's motion to dismiss Edenbrook's material
2  misstatement claim identified above is granted.

**III.    ALLEGATION OF LOSS CAUSATION**

The parties dispute whether Edenbrook is able to plead loss causation based on its inability to sell its shares of RhythmOne until roughly a month after the merger.  Typically, in securities cases, loss causation is shown by the drop in share price due to a misstatement or omission by the defendant.  *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016) ("The burden of pleading loss causation is typically satisfied by allegations that the defendant revealed the truth through corrective disclosures which caused the company's stock price to drop and investors to lose money.") (internal quotation marks and citations omitted).  Edenbrook does not allege that the material omission discussed above led to the drop in the price of RhythmOne's stock.  Oppo. at 16.

Instead, Edenbrook alleges that it suffered a loss by being unable to sell its shares in RhythmOne earlier due to the delay incurred by the time it took RhythmOne to mail its broker the paper stock certificate, and the added time Edenbrook's broker required to then break the certificate down into units for each of the broker's clients.  Compl. at ¶¶ 4, 43, 47, 49-50.  It argues that this delay caused it to miss out on an opportunity to sell its shares during the period of significant selling activity in the days following closing the merger.  *Id.* at ¶ 49.  It alleges, and RhythmOne does not contest, that it would have tendered its YuMe shares if it had known that it was the only way for it to electronically convert its shares.  Reply at 7.

In support of its argument, Edenbrook cites *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) where the Ninth Circuit articulated the test for loss causation as being the familiar test for proximate cause.  "To prove loss causation, plaintiffs need only show a causal connection between the fraud and the loss by tracing the loss back to the very facts about which the defendant lied[.]"  *Id.* (citation and internal quotation marks omitted).  "Disclosure of the fraud is not a sine qua non of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss."  *Id.* (citation and internal quotation marks omitted).  Although *First Solar* was a case where the loss was the drop in share

13

price and not an unexpected delay in the ability to sell, the court stated that "[r]evelation of fraud in the marketplace is simply one of the 'infinite variety' of causation theories a plaintiff might allege to satisfy proximate cause" and that its "approval of one theory should not imply our rejection of others." *Id.* at 754 (internal citations omitted). By way of example, the court stated that "a stock price drop [which] comes immediately after the revelation of fraud can help to rule out alternative causes[,]" "[b]ut that sequence is not a condition of loss causation." *Id.* at 754.

The parties have not cited any cases that are factually analogous to support or preclude a finding of loss causation under these facts. Although this allegation of loss is unusual in the securities context, Edenbrook's allegations plausibly state a claim for loss causation. It claims that it was delayed from taking an action that it would have been entitled to take (and would have taken) as a result of RhythmOne's omission, and that the delay caused it to suffer an economic loss. If this general description of events were found outside of the securities context, it would not be controversial to find that loss causation was adequately stated. As the Ninth Circuit articulated in *First Solar*, the test to be applied is simply the familiar proximate cause test, not one that is unique to securities cases. 881 F.3d at 753. Accordingly, I find that Edenbrook has adequately alleged loss causation.

## CONCLUSION

RhythmOne's motion to dismiss is granted in part and denied in part. Edenbrook has failed to plead a material misstatement by RhythmOne, but has pleaded a material omission and loss causation. Edenbrook is given leave to amend its material misstatement claim within 20 days of this Order.

**IT IS SO ORDERED.**

Dated: April 24, 2019

William H. Orrick
United States District Judge